**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 29 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JAIME ALVAREZ,

    Defendant-Appellant.

No. 97-4061

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 94-CR-69)**

---

Robert L. Booker, Booker & Associates, Salt Lake City, Utah, for Defendant-Appellant.

Bruce C. Lubeck, Assistant United States Attorney (Scott M. Matheson, Jr., United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

---

Before **PORFILIO** , **HOLLOWAY** , and **HENRY** , Circuit Judges.

---

**HENRY** , Circuit Judge.

---

    Jaime Alvarez (1) requests that this panel overturn a prior panel's decision,

which reversed the district court's order suppressing 300 pounds of cocaine that

the Utah state police discovered in a truck that he was driving and (2) appeals the district court's decision to deny his motion to suppress a pair of incriminating statements that he subsequently made to state and federal law enforcement officers. We have jurisdiction under 28 U.S.C. § 1291 and Fed. R. Crim. P. 11(a)(2) and affirm both decisions.

## BACKGROUND

### The Stop

On the afternoon of April 14, 1994, as his patrol car passed a U-Haul truck driving on I-15 near Beaver, Utah, Utah Highway Patrol Trooper Craig Gaines noticed that the registration sticker on the U-Haul had expired. Suspecting that the truck might be stolen, Officer Gaines pulled it over. After exiting his vehicle, Officer Gaines walked to the driver's side of the U-Haul. The driver, Jaime Alvarez, immediately provided Officer Gaines with both his driver's license and rental agreement.

Officer Gaines informed Mr. Alvarez that he had stopped him because of the expired registration sticker. In response to Officer Gaines's questioning, Mr. Alvarez explained that he and his girlfriend were traveling to Boston and that they were using the U-Haul to move their clothes. Officer Gaines then questioned Mr. Alvarez's girlfriend, who was sitting in the passenger seat, in order to check Mr. Alvarez's story. Although her responses did not reveal any inconsistencies,

2

during the questioning Officer Gaines noted the strong smell of air freshener in the truck and the presence of air freshening pellets on the floor of the cab.

After asking a handful of additional questions to Mr. Alvarez regarding his destination and the contents of the truck, Officer Gaines requested and received permission from Mr. Alvarez to search the truck. At this point, the encounter had lasted less than two minutes. The search that followed uncovered 300 pounds of cocaine in the rear of the U-Haul. Officer Gaines arrested Mr. Alvarez and his girlfriend and took them to the Beaver County Jail.

### Mr. Alvarez's Statements

At approximately 7:45 that same evening, Agent Garth Wilkinson of the Utah Division of Investigations arrived at the Beaver County Jail and met with Mr. Alvarez. Agent Wilkinson met with Mr. Alvarez in an interview room; Mr. Alvarez was not handcuffed. Although Mr. Alvarez is a native of Colombia, he has lived in the United States for over 25 years, graduated from high school in the United States, and attended Amherst College and the University of Massachusetts. Not surprisingly, the district court found that he speaks English well.

After Agent Wilkinson advised Mr. Alvarez of his Miranda rights, Mr. Alvarez agreed to speak with Agent Wilkinson. Mr. Alvarez admitted that he knew the drugs were in the truck and that he was transporting them for money. Agent Wilkinson asked Mr. Alvarez if he would consider completing the delivery,

and Mr. Alvarez indicated that he would. Mr. Alvarez asked what type of deal could be made, and Agent Wilkinson responded that he would recommend a lesser sentence but that, ultimately, the U.S. Attorney's office and the court would make the decision as to his Mr. Alvarez's sentence. Mr. Alvarez then stated that he wished to speak with the U.S. Attorney. Agent Wilkinson had worked with the Drug Enforcement Agency in the past, so he informed Mr. Alvarez that he would contact the DEA.

Agent Wilkinson immediately contacted the DEA and, after speaking with a DEA agent, put Mr. Alvarez on the phone so that he could speak with the DEA agent. When Mr. Alvarez got off the phone, he stated that he wanted to consult an attorney for one purpose: to ensure that he was getting a good deal. Agent Wilkinson immediately called a Utah state judge, who instructed him to telephone John Christiansen, the Beaver County Public Defender.

Although Mr. Christiansen had practiced law in Utah for more than 40 years (36 of which he spent as the Beaver County Prosecutor), he was not admitted to practice in Utah federal court in April of 1994. Mr. Christiansen had been admitted to practice law in Utah federal court until approximately three years earlier (when he had allowed his membership to lapse by failing to pay the required $15.00 annual fee), but he had never practiced in federal court.

Agent Wilkinson called Mr. Christiansen at home at 8:30 that evening and explained the situation to him.  Agent Wilkinson then handed the phone to Mr. Alvarez, who spoke with Mr. Christiansen for a few minutes.  Mr. Alvarez informed Mr. Christiansen that he had decided to cooperate with federal authorities.  Mr. Christiansen did not offer Mr. Alvarez any advice during the conversation, but he did agree to come to the jail the next day to meet with Mr. Alvarez.

After spending the night in the Beaver County Jail, Mr. Alvarez met with Mr. Christiansen the next morning.  Mr. Christiansen discussed the pluses and minuses of cooperating with the DEA, explaining that cooperation might lessen his sentence but that it would also hurt his defense if he chose to go to trial.  After this meeting, Mr. Alvarez and Mr. Christiansen then met with DEA Agents Brady MacKay and Maria Tellez-Waters (whose role was to act as a translator, if necessary).  After once again receiving Miranda warnings, this time both in English and Spanish, Mr. Alvarez once again incriminated himself.  During the meeting, Mr. Alvarez informed Agent MacKay that a controlled delivery was not possible, as another vehicle had been traveling in convoy with him and was aware that he had been arrested.

Agent MacKay testified that during the meeting, he did not make any specific promises to Mr. Alvarez regarding a reduction in sentence but that he did

5

tell Mr. Alvarez he would communicate any cooperation to the U.S. Attorney's office. Mr. Alvarez testified that Agent MacKay told him that, if he cooperated, Agent MacKay would release Mr. Alvarez's girlfriend and recommend a lesser sentence. Agent MacKay denied that he made any promises about releasing Mr. Alvarez's girlfriend. However, later that same day, after he had determined that Mr. Alvarez's girlfriend was not aware of the drugs and had consulted with the U.S. Attorney's office, Agent MacKay did, in fact, release Mr. Alvarez's girlfriend.

### The Legal Proceedings

On April 15, after Mr. Alvarez had made his statement to the DEA agents, the government filed charges against him. A grand jury returned an indictment charging Mr. Alvarez with one count of violating 21 U.S.C. § 841(a)(1), possession of a controlled substance with intent to distribute. Mr. Alvarez subsequently filed a motion to suppress the cocaine that Officer Gaines had discovered in the rear of the U-Haul. Upon the recommendation of the magistrate, the district court granted Mr. Alvarez's motion. Another panel of this court reversed the district court's decision. United States v. Alvarez, 68 F.3d 1242 (10th Cir. 1995) (Alvarez I). The Supreme Court denied Mr. Alvarez's petition for certiorari. Alvarez v. United States, 116 S. Ct. 1436 (1996).

6

After this court remanded the case to district court, Mr. Alvarez made a second motion to suppress, seeking not only to suppress the cocaine but also the incriminating statements that he made on April 14 and 15, 1994. The district court informed Mr. Alvarez that it would not revisit the issue of suppressing the cocaine and, upon the recommendation of the magistrate, denied suppression of the two statements. Mr. Alvarez then entered a guilty plea, reserving his right to appeal the district court's refusal to suppress the cocaine and the incriminating statements.

After Mr. Alvarez filed this appeal, he petitioned this court for a hearing en banc. We denied that petition.

## DISCUSSION

### I. Suppression of Cocaine

Mr. Alvarez devotes the lion's share of his brief to arguing that the search of his U-Haul and the subsequent seizure of the 300 pounds of cocaine violated the Fourth Amendment. However, as discussed above, one panel of this court has already ruled that this search and seizure was lawful. See Alvarez I, 68 F.3d at 1245. Mr. Alvarez nonetheless contends that "[t]his Court reviews de novo the prior panel's decision." Under our precedent, he is wrong.

"The law of the case 'doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent

7

stages in the same case.'" United States v. Monsisvais, 946 F.2d 114, 115 (10th Cir. 1991) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)). Accordingly, "when a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal." Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1183 (10th Cir. 1995). This doctrine is "based on sound public policy that litigation should come to an end and is designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided." Gage v. General Motors Corp., 796 F.2d 345, 349 (10th Cir. 1986) (citations omitted). Of course, this rule "also serves the purposes of discouraging panel shopping at the court of appeals level." Monsisvais, 946 F.2d at 116.

We recognize that "the 'law of the case' doctrine is not an inexorable command," White v. Murtha, 377 F.2d 428, 431 (5th Cir. 1967), but, rather, "only a rule of practice in the courts and not a limit on their power." Monsisvais, 946 F.2d at 116. Nonetheless, this panel is not an en banc panel and, thus, is not in the business of overturning prior panels' decisions. Particularly with today's crowded dockets, "a litigant given one good bite at the apple should not have a second." Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 900 (Fed. Cir. 1984). In short, it is almost axiomatic that one panel of this court cannot

overrule another panel. See, e.g., United States v. Zapata, 997 F.2d 751, 759 n.6 (10th Cir. 1993).

However, we will depart from the law of the case doctrine in three exceptionally narrow circumstances:

(1)     when the evidence in a subsequent trial is substantially different;

(2)     when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or

(3)     when the decision was clearly erroneous and would work a manifest injustice.

See Monsisvais, 946 F.2d at 117.

Mr. Alvarez has not suggested that there is new evidence or new law that would call the prior panel's decision into question. Instead, he undertakes the formidable task of attempting to convince us that the prior panel's decision was clearly erroneous and would work a manifest injustice. However, Mr. Alvarez has not directed our attention to a single case in which such an argument has prevailed, and our own research indicates that while courts may often pay lip service to the clearly erroneous/manifest injustice exception, they rarely, if ever, invoke it. In fact, in the only case we found in which a panel used this exception, Jeffries v. Wood, 75 F.3d 491, 493-94 (9th Cir. 1996), the en banc court subsequently reversed the panel. See Jeffries v. Wood, 114 F.3d 1484, 1492-93 (9th Cir.) (en banc), cert. denied, 118 S. Ct. 586 (1997).

9

In Alvarez I, another panel of this court ruled that Officer Gaines did not violate the Fourth Amendment when he requested and received permission from Mr. Alvarez to search the U-Haul. Far from being clearly erroneous, this decision is consistent with the law of this circuit. See United States v. Soto, 988 F.2d 1548, 1557-58 (10th Cir. 1993) (holding that a defendant's consent to a search of his vehicle was voluntary notwithstanding fact that a police officer held the defendant's license and registration at the time the officer requested consent to search). Moreover, Mr. Alvarez has failed to explain, as he must in order to prevail, how Alvarez I would work a manifest injustice.

All litigation, even this litigation, must come to an end. Three years ago, Mr. Alvarez brought the issue of cocaine suppression before this court. He had the opportunity to prevail upon us then, and he failed. Although we note the apparent sincerity of counsel, the brunt of the current appeal is nothing more than a replay of the same performance before a different Tenth Circuit audience. Accordingly, we affirm the denial of Mr. Alvarez's motion to suppress the cocaine.[1]

## II.    Suppression of Statements

---

[1] In his brief, Mr. Alvarez again requests a hearing en banc. However, because we have already denied one such request from Mr. Alvarez, we will not entertain a second. See 10th Cir. R. 35.1.

Mr. Alvarez also seeks suppression of the two incriminating statements he made to state and federal law enforcement officers on April 14 and 15, 1994, arguing that the officers obtained those statements in violation of the Fifth Amendment and Miranda v. Arizona , 384 U.S. 436 (1966). Although we review questions of law de novo, we will not disturb the district court's factual findings unless they are clearly erroneous. United States v. Glass , 128 F.3d 1398, 1405 (10th Cir. 1997). And because the district court denied Mr. Alvarez's motion to suppress these statements, we view the evidence in the light most favorable to the government. Id.

In Miranda , the Supreme Court held that

> [p]rior to any questioning, [a] person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney. . . . If . . . he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking[,] there can be no [more] questioning.

446 U.S. at 444-45. The Court has also recognized that police interrogation can be "so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear." Ashcraft v. Tennessee, 322 U.S. 143, 154 (1944). Accordingly, where conditions of interrogation are so coercive that they rob suspects of their free will, courts will suppress defendants' statements notwithstanding the fact that these statements came on the heels of properly

11

administered Miranda warnings. See, e.g. , Martucci v. Johnson , 944 F.2d 291 (6th Cir. 1991); United States v. Anderson , 929 F.2d 96 (2d Cir. 1991).

In this case, there can be no question that Mr. Alvarez's first incriminating statement (the one he made to Utah Bureau of Investigations Agent Wilkinson on the evening of April 14) is admissible. After Agent Wilkinson administered a proper Miranda warning to Mr. Alvarez, Mr. Alvarez chose to waive his right to counsel and his right to remain silent and, instead, made a statement incriminating himself. He made this statement to Agent Wilkinson less than 2 ½ hours after his arrest, and he has offered no evidence that the conditions of his detention at the Beaver County Jail were in any way coercive. In short, Mr. Alvarez has not offered any evidence that this statement was anything other than a product of his voluntary and fully-informed decision to cooperate with the authorities. [2] Accordingly, the district court properly denied his motion to suppress this statement.

_____

[2]At points in his briefs, Mr. Alvarez emphasizes that no Spanish translator was provided when he spoke privately with his attorney, John Christiansen, who spoke no Spanish. We also note that no translator was present when Mr. Alvarez made his statement to Agent Wilkinson. However, Mr. Alvarez (1) was admittedly fluent in English (2) earned a high school diploma in the United States and (3) attended college at Amherst College and the University of Massachusetts. Given these facts, we do not find it significant that no translator was present during Mr. Alvarez's meetings with Agent Wilkinson or Mr. Christiansen.

Mr. Alvarez also seeks to suppress a statement he made the following day (April 15) to DEA Agents MacKay and Tellez-Waters. Although Mr. Alvarez made this statement (1) in the presence of his attorney, John Christiansen (2) after he had met privately with Mr. Christiansen and (3) after the DEA agents had administered Miranda warnings to him, Mr. Alvarez contends that the DEA agents' questioning somehow ran afoul of Miranda.

Mr. Alvarez has not cited any cases, nor have we discovered any, in which a court found a Miranda violation despite the fact that the defendant made the incriminating statement in the presence of his counsel. Nonetheless, in an attempt to demonstrate that the DEA agents coerced his confession, Mr. Alvarez points to the following alleged acts of the DEA agents: (1) they promised him leniency if he cooperated; (2) they were aware that Mr. Alvarez was extremely concerned about the well-being of his family in Colombia; (3) they agreed to and did release Mr. Alvarez's girlfriend; and (4) they discussed creating certain false documents in order to allow him to complete a controlled delivery.

However, the record does not bear out Mr. Alvarez's claim of coercion. First, Mr. Alvarez admitted at the suppression hearing that the DEA agents made no promises of leniency: "They didn't promise. They told me that they would recommend [a lesser sentence]." Rec. vol. VII, at 101. Similarly, although Mr. Alvarez voiced concerns about his family's safety to the DEA agents, he conceded

13

that "[t]hey didn't ever promise" to take any action to protect his family. Id. at 102. And the DEA agents' mere awareness of Mr. Alvarez's concerns for his family could not, without more, transform an otherwise voluntary statement into the product of coercion. See Colorado v. Connelly, 479 U.S. 157, 165 (1986) ("[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, . . . [a defendant must demonstrate a] link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other.").

The last two alleged facts cited by Mr. Alvarez to demonstrate coercion-- the promised release of his girlfriend and the offer to falsify documents if he would cooperate--also fail. At the suppression hearing, Agent MacKay denied that he made any promises about releasing Mr. Alvarez's girlfriend or that he had discussed preparing falsified documents that would enable Mr. Alvarez to make a controlled delivery. Although Mr. Alvarez testified to the contrary, we cannot say that the district court erred in believing Agent MacKay rather than Mr. Alvarez; after all, the district court was in a much better position than we to judge the credibility of the witnesses at the suppression hearing. See United States v. Waupekenay, 973 F.2d 1533, 1536 (10th Cir. 1992).

In sum, the evidence fails to show that the district court erred when it determined that Mr. Alvarez made a voluntary and fully-informed decision to

14

speak with the DEA agents. He made his statement in the presence of his attorney, after the agents had afforded him the opportunity to meet privately with his attorney and had informed him of his <u>Miranda</u> rights. Mr. Alvarez has failed to show that the DEA agents made any promises to him or did anything that rendered his confession involuntary. Consequently, we affirm the district court's refusal to suppress this statement.

## III. Ineffective Assistance of Counsel

In an attempt to further buttress his claim that the DEA agents violated his <u>Miranda</u> rights, Mr. Alvarez cites five purported shortcomings of his attorney, Mr. Christiansen: (1) he did not speak Spanish; (2) he was blind; (3) he appeared to be over 80 years old; (4) he was not admitted to practice in Utah federal courts; and (5) he did not regularly represent criminal defendants. However, these factors, even if proven true, are not relevant to our <u>Miranda</u> analysis.

<u>Miranda</u> holds that, prior to beginning custodial interrogation, law enforcement officers must apprise suspects of their rights. <u>See</u> 384 U.S. at 444. <u>Miranda</u> also requires that these officers cease such questioning any time a suspect requests an attorney. <u>Id.</u> at 444-45. The right, once invoked, to have an attorney present during custodial interrogation is intended "to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." <u>Id.</u> at 469. Thus, the <u>Miranda</u>

15

requirements aim to "protect [a suspect's] Fifth Amendment privilege" against self-incrimination. Id. at 470.

Although Miranda does provide for the appointment of counsel (upon request) in order to ensure that suspects fully understand their rights under the Fifth Amendment, the decision does not speak to the quality of representation that suspects should receive once the court has appointed attorneys for them. For such claims, we look to the Sixth Amendment and its guarantee that a defendant will receive "Assistance of Counsel in his defence." U.S. Const. amend. VI. Accordingly, we will construe Mr. Alvarez's complaints regarding Mr. Christiansen's performance as raising a Sixth Amendment claim for ineffective assistance of counsel.

However, Mr. Alvarez's ineffective assistance claim simply cannot stand. The Sixth Amendment right to counsel "does not attach until the initiation of formal adversary criminal proceedings[,] 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Lucero v. Gunter, 17 F.3d 1347, 1351 (10th Cir. 1994) (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972)). On the morning of April 15, 1994, when Mr. Alvarez gave his second statement to the DEA agents, the government had not initiated formal proceedings against him. Accordingly, because Mr. Alvarez had no Sixth Amendment right to effective assistance of counsel at the time the DEA agents questioned him, he

16

cannot argue that Mr. Christiansen's performance before or during questioning fell short of the Sixth Amendment's requirements.    See United States v. Rogers   , 1997 W.L. 543365, at **1 (10th Cir. Sept. 3, 1997),    cert. denied  , 118 S. Ct. 701 (1998);  United States v. Gordon   , 4 F.3d 1567, 1572 (10th Cir. 1993).

Moreover, even if Mr. Alvarez did possess a Sixth Amendment right to counsel during the DEA agents' interrogation, his ineffectiveness claim would nonetheless fail.  Under   Strickland v. Washington   , 466 U.S. 668, 687 (1984), a defendant must demonstrate "that counsel's performance was deficient. . . . [and] that the deficient performance prejudiced the defense."  Mr. Alvarez, however, has done neither of these things.  His complaints--that Mr. Christiansen is blind, over 80 years old, non-Spanish-speaking, not admitted to practice law in Utah federal courts, and has seldom represented criminal defendants--have nothing to do with Mr. Christiansen's performance in     *this*  case.

Regardless of whether Mr. Christiansen let his $15.00 annual federal bar dues slide or whether he had devoted most of his career as a lawyer to prosecuting rather than defending defendants, Mr. Alvarez must do more than point to flaws on Mr. Christiansen's resume in order to make out a Sixth Amendment claim. However, Mr. Alvarez has not even attempted to explain how Mr. Christiansen's performance  in this case--which, as far as we can tell, consisted only of (1) advising Mr. Alvarez of the pros and cons of cooperating with the government

17

and, perhaps related to that advice, (2) allowing Mr. Alvarez to make a second incriminating statement to the DEA agents after he had already made one such statement to a Utah Division of Investigations agent and after a Utah police officer had discovered 300 kilograms of cocaine in his rental truck--lacked in any way. And an ineffective assistance claim that does not point to any shortcomings in counsel's performance cannot succeed.

## CONCLUSION

A prior panel of this court refused to suppress the 300 kilograms of cocaine that Officer Gaines discovered in a U-Haul driven by Jaime Alvarez, and we will not disturb that decision. In addition, we hold that the district court correctly denied Mr. Alvarez's motion to suppress the two incriminating statements that he made to state and federal law enforcement officers. Finally, Mr. Alvarez has failed to demonstrate that he had a Sixth Amendment right to counsel at the time the DEA agents questioned him or that his counsel's performance before or during that questioning was lacking in any way. Consequently, we AFFIRM Mr. Alvarez's conviction under 21 U.S.C. § 841(a)(1).

18